# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**LAWRENCE CORDER,**
               **Plaintiff,**

      **v.**                                  **Case No. 17-C-0779**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the Social Security Administration**
               **Defendant.**

---

## DECISION AND ORDER

In this action for judicial review, plaintiff Lawrence Corder challenges the Commissioner's partially favorable decision on his application for social security disability benefits. Plaintiff alleged that he could no longer work due to back pain and a number of other impairments. He underwent back surgery on March 9, 2016, recovering well, and on June 2, 2016, his surgeon released him to return to work without restrictions. A month later, his primary care physician indicated that he could perform a reduced range of medium level work.

The Administrative Law Judge ("ALJ") assigned to the case found plaintiff disabled through June 25, 2016, but concluded that by June 26, 2016, plaintiff had improved to the point where he could handle medium level work and thus perform his past job as a machinist, as well as a number of other jobs in the economy. In reaching this conclusion, the ALJ discounted plaintiff's statements that he remained disabled after his doctors released him, as well as certain of the restrictions recommended by the primary care physician.

Plaintiff challenges the ALJ's evaluation of his statements, the primary doctor's opinions, and the nature of his previous machinist job. Because the ALJ applied the correct legal

standards and supported his work capacity determination with substantial evidence, and because any error regarding past work was harmless given the ALJ's alternate finding that plaintiff could do other jobs, I affirm the ALJ's decision.

## I. STANDARDS OF REVIEW

### A.    Disability Standards

A person qualifies as disabled if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 214 (2002) (citing 42 U.S.C. §§ 423(d)(1)(A), § 1382c(a)(3)(A)).  In determining whether a claimant is disabled, the ALJ applies a sequential, five-step test.  See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Under this test, the ALJ asks:

> (1) Is the claimant currently working, i.e., doing substantial gainful activity?  If so, [he] is not disabled.
>
> (2) If not, does the claimant have a severe medically determinable physical or mental impairment?  If not, the claimant is not disabled.
>
> (3) If so, does the claimant's impairment meet or equal one of the presumptively disabling impairments set forth in the agency's Listings?  If so, the claimant is disabled.
>
> (4) If not, does the claimant retain the residual functional capacity ("RFC") to perform [his] past relevant work?  If so, [he] is not disabled.
>
> (5) If not, can the claimant, based on [his] RFC, age, education, and work experience make an adjustment to other work?  If so, [he] is not disabled.  If not, [he] is disabled.

Lang v. Berryhill, No. 16-C-602, 2017 U.S. Dist. LEXIS 65933, at *2-3 (E.D. Wis. Apr. 29, 2017).  The claimant bears the burden of presenting evidence at steps one through four, but

if he reaches step five the burden shifts to the Commissioner to show that the claimant can make the adjustment to other work. The Commissioner may carry this burden by either relying on the Medical-Vocational Guidelines, a chart that classifies a person as disabled or not disabled based on his age, education, work experience, and exertional ability,[1] or by summoning a vocational expert ("VE") to offer an opinion on other jobs the claimant can do despite his limitations. <u>McQuestion v. Astrue</u>, 629 F. Supp. 2d 887, 892 (E.D. Wis. 2009).

In some cases, the ALJ may find the claimant disabled for a finite amount of time, known as a "closed period." "Before limiting benefits to a closed period, an ALJ must conclude either that a claimant experienced 'medical improvement' as evidenced by changes in the symptoms, signs, or test results associated with [his] impairments, or else that an exception to this rule applies." <u>Tumminaro v. Astrue</u>, 671 F.3d 629, 633 (7th Cir. 2011) (citing 20 C.F.R. § 404.1594). In this situation, the ALJ applies an eight-step test, asking:

(1) Is the claimant engaging in substantial gainful activity? If so, disability ends.

(2) If not, does the claimant have an impairment which meets or equals the severity of an impairment set forth in the Listings? If so, disability continues.

(3) If not, has there been medical improvement? If there has been medical improvement as shown by a decrease in medical severity, proceed to step 4. If there has been no decrease in medical severity, proceed to step 5.

(4) If there has been medical improvement, is it related to the claimant's ability to do work, i.e., has there been an increase in RFC based on the impairment(s)

---

[1]The agency classifies the physical exertion level of jobs as sedentary, light, medium, and heavy. Sedentary work involves lifting no more than 10 pounds and is generally done seated. Light work involves lifting no more than 20 pounds at a time, with frequent lifting or carrying of objects weighing up to 10 pounds, as well as a good deal of walking or standing (about six hours of an eight-hour workday). Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, the agency assumes that he can also do sedentary and light work. <u>See</u> 20 C.F.R. § 404.1567; SSR 83-10.

present at the time of the most recent favorable determination? If medical improvement is not related to the ability to do work, proceed to step 5. If medical improvement is related to the ability to do work, proceed to step 6.

(5) If the ALJ found at step 3 that there has been no medical improvement or at step 4 that the medical improvement is not related to the claimant's ability to work, does an exception apply? If not, disability continues.[2]

(6) If the medical improvement is related to the ability to work, are the claimant's current impairments severe? If not, disability ends.

(7) If the current impairments are severe, will the claimant's current RFC permit the performance of [his] past work? If so, disability ends.

(8) If the claimant cannot perform past work, is [he] able, given [his] current RFC, age, education, and experience, to perform other work? If so, disability ends. If not, disability continues.

Lang, 2017 U.S. Dist. LEXIS 65933, at *3-4 (citing 20 C.F.R. § 404.1594(f)).

## B.    Judicial Review

The reviewing court does not redetermine disability but rather decides whether the ALJ's decision applies the correct legal standards and is supported by substantial evidence. Summers v. Berryhill, 864 F.3d 523, 526 (7th Cir. 2017). Legal conclusions are reviewed de novo, factual findings deferentially. Casey v. Berryhill, 853 F.3d 322, 326 (7th Cir. 2017). Findings supported by such relevant evidence as a reasonable mind might accept as adequate to support the conclusion must be upheld. Moreno v. Berryhill, 882 F.3d 722, 728 (7th Cir. 2018). The court may not re-weigh the evidence or substitute its judgment for that of the ALJ. Summers, 864 F.3d at 526. While the ALJ must provide an accurate and logical bridge between the evidence and his conclusions, he is not required to address in writing every piece

_____

[2]An exception will apply if, for instance, the prior disability determination was fraudulently obtained, the claimant fails to cooperate with the agency, the agency is unable to find the claimant, or the claimant fails to follow prescribed treatment that would restore his ability to work. See 20 C.F.R. § 404.1594(e).

4

of evidence and testimony contained in the record.  Murphy v. Colvin, 759 F.3d 811, 815 (7th

Cir. 2014).

## II.  FACTS AND BACKGROUND

### A.  Summary of the Case

Plaintiff applied for benefits in February 2013, alleging a disability onset date of January

1, 2012, which he later amended to December 16, 2014.  He reported previous employment

in a number of positions, including machinist and parts inspector; he also advised that for a

time he cleaned rooms at the hotel where he and his girlfriend lived in exchange for free rent.

He alleged that he could no longer work due to a variety of impairments, including back,

shoulder, leg, and heart problems.  In his initial decision in the case, issued in October 2015,

the ALJ found that plaintiff's impairments limited him to sedentary work, but that he could still

do his past job as an inspector.  The Appeals Council reversed, primarily because the record

did not establish that plaintiff held the sedentary inspector job long enough for it to qualify as

past relevant work.[3]  On remand, the ALJ found plaintiff disabled from December 16, 2014,

through June 25, 2016, but not thereafter, and this appeal concerns the ALJ's finding of

medical improvement as of June 26, 2016.  I first set forth the pertinent medical evidence and

the procedural history of the case, before turning to plaintiff's challenges to the ALJ's decision.

### B.  Medical Evidence

Plaintiff suffered a heart attack, with placement of stents, in 2010.  (Tr. at 452, 461, 956,

969.)  During subsequent follow ups, plaintiff's cardiologist, Dr. James Moran, found plaintiff's

_____

[3]"Past relevant work" is work that (1) the claimant has done within the past 15 years, (2) was substantial gainful activity, and (3) lasted long enough for the claimant to learn to do it. 20 C.F.R. § 404.1560(b)(1).

coronary artery disease to be clinically stable with no new complaints. (Tr. at 447-48, 472, 603, 613, 1191, 1195.) The medical evidence also records a history of leg fractures (Tr. at 452, 461, 969-70), but x-rays taken in June 2013 showed healing fractures with no acute problems (Tr. at 460). The record sets forth a more extensive course of treatment for plaintiff's back impairment, culminating in the March 2016 surgery. The record also documents a surgery for carpal tunnel syndrome in July 2015, as well as sporadic complaints of knee and shoulder pain.

In April 2012, plaintiff went to the emergency room complaining of low back pain, radiating into his legs. (Tr. at 551.) Doctors provided Vicodin and ordered a lumbar MRI (Tr. at 552), which revealed mild to moderate degenerative changes, most prominent at the L4 level (Tr. at 549-50, 553). Later that year, plaintiff received a series of epidural steroid injections, along with physical therapy and pain medications. (Tr. at 450, 451, 546, 544-45, 542-43, 540-41.)

In March 2013, plaintiff reported significant relief from the injections until recently. He also reported shoulder pain following a slip in January, when he grabbed a railing to catch himself. He denied any weakness in the arm. On exam, he displayed a non-antalgic gait, with full hip and knee range of motion, and negative straight leg raise for radiating pain. Examination of the left shoulder showed no visible abnormalities; range of motion was full and symmetric with the right, and he had full strength in the upper extremities. (Tr. at 457.) He was encouraged to remain active, pursue some weight loss, and discuss the possibility of anti-inflammatory medications with Dr. Moran. It was thought to be too soon for more injections. If his back symptoms persisted, however, he would follow up to determine whether surgical intervention was necessary. (Tr. at 458.) A June 2013 x-ray of left shoulder revealed acromioclavicular arthropathy. (Tr. at 459.)

6

In July 2013, after he filed his application for benefits, plaintiff underwent an orthopedic consultative examination with Dr. Kurt Reintjes set up by the agency. Plaintiff reported a progressive history of lower back pain that had become more pronounced since January 2012. He also reported pain in both shoulders. (Tr. at 461.) On exam, he stood 5'9" and weighed 215 pounds. Upper extremity exam demonstrated full range of motion with bilateral grip strength of 5 out of 5 and intact dexterity. No tenderness or crepitation was noted in either shoulder, and he had full strength in all major muscle groups. Both knees demonstrated full range of motion, but with significant crepitus in the right knee when flexed to greater than 110 degrees and moving into a fully extended position. Spinal exam demonstrated forward flexion to 70 degrees, rear extension to 35 degrees returning to a neutral position without any difficulty. Straight leg raises were negative bilaterally. (Tr. at 462.) Gait and station were normal. Dr. Reintjes concluded that plaintiff experienced mechanical lower back pain due to a degenerative process of the lower lumbar spine, exacerbated by heavy lifting, pushing, or pulling in a repetitive fashion. The pain appeared to be well controlled when he was more sedentary and performed appropriate exercises. He also reported shoulder pain, which could be bilateral rotator cuff syndrome, though these were not presenting as any significant findings during the exam. His right lower leg functioned well, only with the note of significant patellofemoral crepitus during flexion and extension of the right knee. (Tr. at 463.)

In November 2013, plaintiff went to the emergency department for left hip pain, worse with ambulation and prolonged sitting. (Tr. at 494.) On exam, he displayed normal range of motion without pain and normal gait; x-rays were unremarkable. Doctors concluded that the pain seemed to be inflammatory in nature, prescribing a Prednisone burst. If not improved, he was to seek a physical therapy referral from his primary doctor. (Tr. at 497, 509.)

On December 6, 2013, plaintiff saw his primary physician, Michelle Wagner, M.D., reporting back pain of several years' duration. He indicated that he used to have pain down both legs, but now just in the left hip and knee. Injections had decreased his pain for a while, but he now thought he might need surgery, although he did not want to look into that immediately. The medications he had received in the emergency room in November helped. (Tr. at 591.) On exam, he displayed mild tenderness to palpation of lumbar paraspinal muscles, no knee effusion, and positive straight leg raise on the left. Gait and station were normal. Dr. Wagner provided Tramadol for pain, along with a referral to pain management for another round of injections or other treatment short of surgery. (Tr. at 593.) On December 16, 2013, plaintiff saw Robert Culling, D.O., regarding a new series of injections. (Tr. at 493.)

On January 9, 2014, plaintiff advised Dr. Wagner that the Prednisone and Tramadol had worked for awhile but his left leg pain was now worse. He also complained of pain on the medial side of the left knee. (Tr. at 594.) On exam, he displayed normal range of motion, no joint effusion, tender lumbar paraspinal muscles on the left, and normal gait and station. Dr. Wagner assessed low back pain with radiculopathy, ordering a repeat MRI, adding Tylenol #3, refilling Tramadol, and advising plaintiff to continue to see pain management for injections. She also obtained x-rays of the knee and would consider a cortisone injection if the knee pain persisted. (Tr. at 595.) The left knee x-rays revealed no evidence of fracture, dislocation, or other acute osseous abnormality; small joint effusion was present. (Tr. at 582.) The lumbar MRI revealed moderate degenerative changes in the lumbar spine, most prominent at L4, worse compared to the previous scan. (Tr. at 500-01.)

On January 15, 2014, plaintiff told Dr. Wagner that since starting Tylenol #3 his knee pain had not been bothering him at all, so she decided to hold off on an injection. (Tr. at 596.)

8

On exam, he displayed tenderness to palpation of the joint lines of the left knee, no effusion, and well-preserved range of motion. (Tr. at 597.) However, on January 31, 2014, plaintiff complained of increased right shoulder and left knee pain. The medications had been helping, but he ran out of both Tylenol #3 and Tramadol. (Tr. at 598.) On exam, he displayed tenderness to palpation of the medial joint line of the left knee, with no joint effusion or erythema. The right shoulder was tender at the AC joint, with clicking heard with rotation of the humerus; he displayed well-preserved range of motion, though some movements caused mild discomfort. He had full strength in the upper extremities, as well as normal gait and station. Dr. Wagner injected the knee, ordered x-rays of the shoulder, and refilled Tramadol and Tylenol #3. (Tr. at 600.) The right shoulder x-ray showed mild degenerative change of the acromioclavicular joint, with no evidence of fracture or dislocation. (Tr. at 583.)

On March 3, 2014, plaintiff saw Dr. Wagner for follow up, reporting that his knee was much better since the injection. (Tr. at 600-01.) However, his back had been more painful, with the medications not working as well. (Tr. at 601.) On exam, he displayed mild lumbar paraspinal tenderness, with no active muscle spasm, normal gait and station, and normal strength in the bilateral lower extremities. Dr. Wagner provided a referral for low back injections, which he had been unable to obtain previously due to lack of insurance. In the meantime, she increased his pain medication to Tylenol #4 and refilled Tramadol. (Tr. at 602.) In April 2014, plaintiff received lumbar injections from Dr. Shailesh Joshi at the pain clinic. (Tr. at 531-34, 1120-23.)

On May 21, 2014, plaintiff told Dr. Wagner that the injections had helped, but his pain was returning. (Tr. at 606.) On exam, he displayed mild tenderness to palpation of the lumbar paraspinal muscles, no active spasm, no pain at the SI joints, normal range of motion of the

hips, negative straight leg raise bilaterally, and normal gait and station.  His low back pain seemed more muscular in origin at that time, so Dr. Wagner provided a Prednisone burst to calm down the inflammation and started a muscle relaxer.  (Tr. at 607.)

On June 4, 2014, plaintiff reported that the steroids and medications had helped. (Tr. at 608.) On exam, he displayed mild tenderness to palpation of the lumbar paraspinal muscles, no active spasms, negative straight leg raise bilaterally, and normal gait and station.  (Tr. at 609.) Dr. Wagner prescribed a course of physical therapy (Tr. at 610), which plaintiff canceled after just three sessions, indicating that it was not helping (Tr. at 898-99).

On July 21, 2014, plaintiff saw Dr. Michael McNett for pain management.  (Tr. at 811.) On exam, he displayed little if any hypertonicity or tenderness of the lumbar pasaspinal muscles; straight leg raise was negative on the right, positive on the left.  (Tr. at 813.)  Dr. McNett prescribed Gabapentin and Cymbalta.  (Tr. at 815.)[4]  Plaintiff followed up with Corina Welch, PA-C, on August 20, doing well on Gabapentin.  He also reported using Hydrocodone, which he had received from his primary doctor. (Tr. at 816.)  Medications were continued.  (Tr. at 818.)  On October 16, plaintiff indicated that for the most part his pain was controlled.  (Tr at 819.)  On exam, he rose independently and ambulated with a mildly antalgic gait and mildly stooped posture, with tenderness to palpation about the lumbar spine.  Straight leg raise was negative. PA Welch continued Gabapentin, Cymbalta, and Hydrocodone, and encouraged him to resume a home exercise program for core strengthening.  (Tr. at 820.)  On December 15, plaintiff again indicated that his pain was controlled for the most part; some days he had next

---

[4]From July 24, 2014, through June 15, 2015, plaintiff also received chiropractic treatment for his back.  (Tr. at 664-701, 1208.)  He generally reported mild or intermittent back pain (e.g., Tr. at 665, 683), but with aggravations based on activities such as  shoveling snow (Tr. at 669, 668) and trying to start a lawn mower (Tr. at 666).

to no pain.  (Tr. at 822.)  On exam, he rose independently, ambulated with a non-antalgic gait, with negative straight leg raise.  (Tr. at 823.)  PA Welch continued medications and ordered a lumbar brace for him to wear when walking his dog.  (Tr. at 824.)  On February 12, 2015, plaintiff reported that he had been out of Gabapentin for about two weeks.  He had not noted much change in his pain.  He continued to complain of right lower extremity pain.  He also reported bilateral shoulder pain, right greater than left.  (Tr. at 825.)  On exam, he rose independently to a standing position and ambulated with a non-antalgic gait; straight leg raise was negative and strength full.  There was tenderness about the lumbar spine.  Bilateral shoulders had limited range of motion, with mild decreased strength with resisted external rotation and mild crepitus with range of motion above 90 degrees, but no tenderness over the AC joints.  (Tr. at 826.)  PA Welch planned physical therapy for both shoulders, with cortisone injections to follow if he did not respond.  She also continued Cymbalta, Gabapentin, and Hydrocodone.  (Tr. at 827.)

On March 7, 2015, plaintiff returned to Dr. Wagner, complaining of left hand/wrist pain, numbness, and tingling for the past week.  (Tr. at 610.)  On exam, he had normal range of motion of the wrists and hands, no tenderness to palpation of the left wrist, elbow, or fingers, and positive Tinnel's and Phalen's tests on the left.  She assessed left carpal tunnel syndrome, providing a wrist splint; if the problems persisted, they would consider an EMG test or referral to a hand specialist.  (Tr. at 612.)

On April 9, 2015, plaintiff returned to pain management, advising PA Welch that the pain medication was not as effective as it had been.  He was starting a part-time job at a golf course, and she advised him not to overdo it.  On exam, he rose independently to a standing position, ambulating with a mildly antalgic gait and with a cane.  Strength was good.  He

displayed mild tenderness on palpation of the lumbar spine. (Tr. at 829.) She increased his pain medication dose and ordered physical therapy and a TENS unit. (Tr. at 830.)

From April 15 to May 18, 2015, plaintiff attended physical therapy for his back, with the notes indicating improvement in his functioning over this time. (Tr. at 625-63.) At the May 18, 2015 session, plaintiff told the therapist that everything felt perfect over the weekend. He had to clean four or five rooms, and his back felt just fine. He had to do some more cleaning that day as well. (Tr. at 662.)

On May 13, 2015, plaintiff saw Dr. Wagner for follow up of left hand numbness, reporting no improvement with the brace. (Tr. at 619.) She provided a referral to orthopedics for possible injections or surgery. (Tr. at 620.) A May 20, 2015, EMG nerve conduction study of the left upper extremity showed neuropathy at the left wrist compatible with severe left-sided carpal tunnel syndrome. (Tr. at 524.)

On June 4, 2015, plaintiff saw PA Welch, reporting increased fatigue over the last week, although the change in his pain medication had been beneficial. He reported increased pain in the right shoulder; he indicated that he had been scheduled to undergo rotator cuff surgery years ago but lost his insurance and had not sought further treatment for it since then. (Tr. at 832.) On exam, he rose independently to a standing position and ambulated with a non-antalgic gait. Right shoulder range of motion was well maintained with pain above 90 degrees, and 4/5 strength with resistance on the right. (Tr. at 833.) PA Welch continued medications and would seek authorization for a right shoulder injection. (Tr. at 834.)

On June 9, 2015, plaintiff saw Dr. Thomas Niccolai for his left wrist pain and numbness. (Tr. at 621.) On exam, he had full wrist range of motion and good grip strength. Dr. Niccolai assessed carpal tunnel syndrome, recommending carpal tunnel release under local anesthesia.

12

(Tr. at 622.)  On July 13, 2015, Dr. Niccolai performed the release procedure.  (Tr. at 703-04.)

Plaintiff experienced a post-surgical infection (Tr. at 726, 735, 740, 748-49, 754-55), which

required an incision and drainage procedure later that month, followed by a course of

antibiotics (Tr. at 797.)  By August 5, plaintiff reported that his pain had resolved and his  hand

felt good.  (Tr. at 804.)  On August 12, he reported no problems other than itching around the

incision.  On exam, he displayed fairly decent wrist range of motion.  Hand strength was full

and symmetric.  (Tr. at 807.)  At an August 19 follow-up, his wrist range of motion was full and

symmetric, and hand strength full and symmetric bilaterally.  He was overall "doing quite well."

(Tr. at 808.)  By September 1, he reported that all of the numbness and tingling had resolved.

He had no pain in the hand, hand strength was full and symmetric, and Tinel's and Phalen's

tests negative.  (Tr. at 943.)  By September 8, he was off oral antibiotics.  He denied pain,

numbness, or tingling in hand.  "His preoperative symptoms have resolved."   (Tr. at 946.)

Strength in his hands was full and symmetric bilaterally, and he had returned to his normal two

hours/day work without difficulty.  "He has no distinct restrictions at this point regarding the

hand."  (Tr. at 946.)  On September 29, he was noted to be doing "exceptionally well."  (Tr. at

946.)  He denied any of his preoperative symptoms and had returned to his normal work

without difficulty.  (Tr. at 946.)  Hand strength was full and symmetric bilaterally, and all

preoperative left hand symptoms had resolved despite the post-surgical complication.  The

provider noted: "He has no real restrictions at this point."  (Tr. at 947.)

On September 28, 2015, plaintiff saw Amy Lovell, PA-C, for follow up of his chronic back

pain, which he indicated had increased since his last visit.  He did report walking a lot the past

weekend when going out of town to Huntley, Illinois.  He was having to stop and bend over

when walking his dog to get pain relief.  He was taking Norco three times per day.  He did

complete a course of physical therapy for his back but was not consistently doing the exercise routine at home. He had a TENS unit, which did provide him with good pain reduction. (Tr. at 949.) On exam, he rose independently and walked with a non-antagic gait. (Tr. at 950.) PA Lovell increased the Norco dose, advised him to routinely do home exercises, and continued Cymbalta and Gabapentin. (Tr. at 951.)

On November 9, 2015, plaintiff advised PA Lovell that the Norco increase was somewhat helpful, but he continued to have pain when walking his dog. He had been doing home exercises but did not notice a difference. (Tr. at 952.) On exam, he rose independently but ambulated with an antalgic gait, using a cane. She recommended further injections (Tr. at 953), which plaintiff received later in November 2015 and in January 2016 (Tr. at 1215-18).

A January 5, 2016, lumbar MRI revealed worsened disc space narrowing at L4-5. (Tr. at 1103.) On February 15, 2016, plaintiff saw Dr. Derek Orton, an orthopedic surgeon, for review of the MRI and discussion of treatment options. Dr. Orton recommended surgery. (Tr. at 1225-30.) On February 23, 2016, Dr. Moran cleared plaintiff for surgery from a cardiac standpoint (Tr. at 1195), and during a pre-operative exam with Dr. Wager on February 25, 2016, plaintiff reported "feeling well overall" (Tr. at 1196). On March 9, 2016, Dr. Orton performed L4-5 posterior inter-body fusion surgery. (Tr. at 1235-36, 1266-69.) Plaintiff returned for follow up on March 21, reporting significant improvement of his low back and radicular pain. There was moderate low back pain that was well controlled with Oxycodone. He reported no lower extremity pain, weakness, or numbness. He did use a walker to aid with ambulation. He was "overall very pleased with his postoperative course at this time. He is wondering when he can return to work as a housekeeper in a hotel." (Tr. at 1236.) On exam, he exhibited decreased range of motion of the lumbar spine, but straight leg raise was negative

and strength 5/5 in all muscle groups tested.  The note indicated: "Mr. Corder is doing very well following surgery.  I expect the remaining low back pain to gradually improve with time. . . .  I advised Mr. Corder to walk as tolerated for exercise.  He may return to work as a housekeeper on a limited basis and with no lifting."  (Tr. at 1240.)

On April 4, 2016, plaintiff saw Dr. Wagner for follow up.  He reported that his "back and radicular pain is vastly improved, with almost no leg pain, and only occasional episodes of back pain."  (Tr. at 1200.)  He was only intermittently taking pain medication.  "He is ambulating well, and reports no new acute complaints beyond right knee pain."  (Tr. at 1200.)  He reported some soreness around his right knee cap, worse with activity, but it never limited his movement.  (Tr. at 1200-01.)  He did have one episode where the knee gave out while playing with his dog.  (Tr. at 1201.)  On exam, Dr. Wagner noted no tenderness or effusion of the right knee, with normal range of motion.  He was to follow up with Dr. Orton regarding his back.  For the knee, she noted no acute instability and only mild pain; he was to work on stretches and call if it worsened, at which time they would consider physical therapy.  (Tr. at 1202.)

On April 21, 2016, plaintiff returned to Dr. Orton's office for follow up.  He reported no radicular pain.  There was mild low back pain that was well controlled with Oxycodone.  He reported no lower extremity pain, weakness, or numbness.  He no longer required any assistance with ambulation.  He was again overall very pleased with his postoperative course and asked about when he could return to work as a housekeeper in a hotel.  (Tr. at 1244.)  On exam, lumbar range of motion was decreased, but he had normal strength.  Dr. Orton noted that plaintiff was doing very well after surgery; he expected plaintiff's remaining low back pain to gradually improve with time.  He was to walk as tolerated for exercise.  He had not been working and would remain off work, using Oxycodone as needed for pain.  (Tr at 1248.)

15

On May 4, 2016, plaintiff saw Dr. Wagner, complaining of left leg pain for two days, concerned about a possible blood clot. (Tr. at 1203.) He was also experiencing pain and stiffness in the right knee, worse in the morning and improving with ambulation. Finally, he reported pain in the left shoulder. He previously had an injection on the right but not the left. (Tr. at 1204.) On exam, he had tenderness at the left AC joint and biceps groove of the left shoulder. He also had tenderness at the medial joint line of the right knee, with no joint effusion. He displayed normal range of motion of the knees. Straight leg raise was negative bilaterally, and gait and station were normal. Dr. Wagner prescribed a short burst of Prednisone, indicating that his knee and shoulder pain would likely improve with that treatment. (Tr. at 1205.)

On June 2, 2016, plaintiff returned to Dr. Orton, reporting no radicular pain and only mild low back pain well controlled with Oxycodone. "No lower extremity pain, weakness, or numbness. Mr. Corder is overall very pleased with his postoperative course at this time. He is ready to return to work." (Tr. at 1253.) Physical exam again revealed negative straight leg raise and full strength in all muscle groups tested. Mental status exam was also normal. Radiographs of the lumbar spine revealed appropriate rod, screw, and graft placement, with no other significant abnormalities. (Tr. at 1256.) Dr. Orton concluded: "I advised Mr. Corder to walk as tolerated for exercise. He will continue Oxycodone as needed for pain. He may return to work." (Tr. at 1256.) Dr. Orton released plaintiff to "unrestricted work," with a return in 12 weeks for clinical and radiographic evaluation. (Tr. at 1257.)

On July 8, 2016, Dr. Wagner prepared a physical RFC questionnaire, listing diagnoses of degenerative disc disease and low back pain, with a fair prognosis. She identified clinical findings and objective signs of sciatica, low back tenderness, and abnormal lumbar MRI. She

opined that pain and other symptoms would occasionally interfere with the attention and concentration needed to perform even simple work tasks. (Tr. at 1287.) Plaintiff could sit and stand more than two hours at a time, and at least six hours total in an eight-hour workday. (Tr. at 1287-88.) He required a job that allowing shifting positions at will and one unscheduled break of 10 minutes duration during an eight-hour workday. He also needed to use a cane or other assistive device with occasional standing/walking. He could lift 20 pounds frequently, 50 pounds occasionally, and frequently engage in postural activities. (Tr. at 1288.) He had no significant limitations in reaching, handling, and fingering. (Tr. at 1288.) His impairments would likely produce good day and bad days, and about two absences per month. These limitations applied as of June 2, 2016. (Tr. at 1289.)

## C.    Procedural History

### 1.    Plaintiff's Application and Supporting Materials

On February 28, 2013, plaintiff applied for disability insurance benefits and supplemental security income, alleging a disability onset date of January 1, 2012. (Tr. at 322, 324.) In a disability report, he listed impairments including torn rotator cuff, herniated disc, broken leg, and heart attack. (Tr. at 386.) He reported past employment as a machine operator, warehouse worker, material handler, maintenance worker, and parts inspector. (Tr. at 388, 393.)

### 2.    Agency Decisions

The agency denied the application initially on July 11, 2013 (Tr. at 147-48, 209, 214), based on the review of Pat Chan, M.D., who concluded that plaintiff could perform light work with limited overhead reaching with the left arm (Tr. at 154-57). Plaintiff requested

17

reconsideration (Tr. at 236), but the agency maintained the denial on October 3, 2013 (Tr. at 167-68, 218, 223), based on the review of Mina Khorshidi, M.D., who opined that he could perform light work with no further limitations (Tr. at 174-77).  On October 23, 2013, plaintiff requested a hearing before an ALJ.  (Tr. at 241.)

### 3.  First Hearing

On August 4, 2015, plaintiff appeared with counsel for his hearing before the ALJ.  The ALJ also summoned a VE.  (Tr. at 67.)  At the start of the hearing, plaintiff's counsel amended the alleged onset date to December 16, 2014, which counsel indicated was the date plaintiff stopped working at the motel.  (Tr. at 74.)

#### a.  Plaintiff

Plaintiff testified that he was 54 years old and had not completed high school.  (Tr. at 74-75.)  He indicated that he last worked for pay in 2013, doing maintenance and cleaning for a company that made kayaks.  (Tr. at 75-76.)  Before that, he worked as a material handler, parts inspector, order picker, and machine operator.  (Tr. at 85-87.)  The machinist job required him to place pieces of metal weighing five to ten pounds in a machine.  (Tr. at 87.)  He lived in a hotel room with his girlfriend.  (Tr. at 76-77.)  In 2014, he cleaned rooms at the hotel in exchange for free rent.  (Tr. at 77-78.)

Plaintiff testified that he recently underwent carpal tunnel release surgery on the left wrist.  He had a vehicle and expected to resume driving once he healed from the surgery.  (Tr. at 79.)  He was hospitalized after the surgery due to complications.  (Tr. at 80.)  He also had degenerative disc disease, which produced back pain, for which he had received injections, which did not help.  (Tr. at 81.)  He also received medications (Tr. at 87) and did home

exercises he learned in physical therapy (Tr. at 88). Physical therapy provided only temporary relief. No other treatment was planned at that point. (Tr. at 92.) Plaintiff testified that he had a heart attack five years earlier, with placement of two stents, and still took medications with no current effects from that condition. (Tr. at 93.)

Plaintiff testified that he spent his time sitting or lying around, walking his dog around the block, and watching TV. (Tr. at 82, 88.) His girlfriend took over his cleaning responsibilities at the hotel in December 2014. (Tr. at 82.) He testified that he also handed over responsibilities for outside work such as cutting the grass and shoveling snow to another guy. (Tr. at 90.) He had looked for work at car dealerships and factories, but no one hired him. (Tr. at 90.) He last applied for a job in the summer of 2013. (Tr. at 91.)

### b. Plaintiff's Girlfriend

Plaintiff's girlfriend testified that she had lived with him for 18 years. (Tr. at 97.) She testified that she took over cleaning the rooms at the hotel the previous year because of plaintiff's back pain. (Tr. at 98.) Asked what plaintiff did after that time, she said: "He tries to do things and he does – he's not like totally disabled. I mean he'll walk, but he won't walk far." (Tr. at 99.) He would walk the dog around the block. Physical activity caused him pain, and some days were worse than others. On a bad day, he would be in bed half the day. (Tr. at 99.) Since December 2014, four days out of seven would be bad, she said. (Tr. at 100.)

### c. VE

The VE classified plaintiff's past work as "material handler," SVP level 3, semi-skilled and heavy; "machine feeder," SVP level 2, unskilled and medium generally, light as plaintiff did it; "industrial cleaner," SVP level 2, unskilled and medium; "housekeeper," SVP level 2,

unskilled and light; "parts inspector," SVP level 4, semi-skilled and light generally, sedentary as performed; and "order picker," SVP level 2, unskilled and medium.[5] (Tr. at 101.) The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and experience, able to work at the light level. (Tr. at 104.) The VE testified that such a person could perform plaintiff's past work as a housekeeper and parts inspector. (Tr. at 104-05.) A limitation to frequent use of the left arm would not affect the parts inspector job. (Tr at 105.)

### 4.    First ALJ Decision

On October 7, 2015, the ALJ issued an unfavorable decision. (Tr. at 187.) The ALJ determined that plaintiff suffered from the severe impairments of degenerative disc disease and osteoarthritis of the right lower extremity, neither of which met a Listing. (Tr. at 192.) The ALJ further found plaintiff capable of the full range of sedentary work and thus able perform his past relevant work as an inspector. (Tr. at 193-96.)

### 5.    Appeals Council Review

Plaintiff sought review by the Appeals Council, and on February 26, 2016, the Council granted his request, vacated the ALJ's decision, and remanded for a new hearing. Specifically, the Council noted that plaintiff did not work as an inspector long enough to learn this semi-skilled job. The Council also directed the ALJ to evaluate plaintiff's obesity and reconsider plaintiff's ability to use his left upper extremity. (Tr. at 202-05.)

_____

[5]SVP ("specific vocational preparation") refers to the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. Jobs with an SVP of 1 (meaning they can be learned with a short demonstration only) and 2 (anything beyond a short demonstration up to and including 1 month) correspond with "unskilled" work. Jobs with an SVP of 3 (over 1 month up to and including 3 months) and 4 (over 3 months up to and including 6 months) are considered "semi-skilled." Jobs with an SVP of 5-9 are considered "skilled" work. See SSR 00-4p, 2000 SSR LEXIS 8, at *8.

**6.    Second Hearing**

On October 4, 2016, plaintiff appeared with counsel for his hearing on remand.  The ALJ again summoned a VE.  (Tr. at 113.)

**a.    Plaintiff**

Plaintiff testified that he was then 55 years old.  (Tr. at 117.)  He had since the previous hearing worked part-time, about two hours per day, at a country club/golf course, cleaning the bar area, but he no longer did that.  (Tr. at 118, 120, 131.)  The ALJ noted that since the last hearing plaintiff had also undergone back surgery.  Plaintiff stated that he was still healing, but the ALJ noted that in June 2016 Dr. Orton cleared plaintiff to return to unrestricted work.  (Tr. at 118.)  Plaintiff acknowledged he was told that but indicated that he had not found a job.  (Tr. at 119.)  Plaintiff testified that he still lived at the hotel, and his girlfriend continued to do the cleaning there.  (Tr. at 120.)

The ALJ then asked about plaintiff's past parts inspector job, which he did full-time and mostly sitting down.  He lifted bags of parts weighing about 15 pounds.  That was his last full-time job.  (Tr. at 121.)  Asked why he could no longer do that job, plaintiff responded that he could not sit that long.[6]  (Tr. at 122.)

Plaintiff testified that he continued to have problems with his left hand following the carpal tunnel surgery (Tr. at 122), but the ALJ noted the treatment records in which plaintiff reported that his preoperative symptoms had resolved, denied any specific problems with his hand, and was noted to be doing exceptionally well (Tr. at 123).  Plaintiff acknowledged that

---

[6]Plaintiff later testified that he did the parts inspector job for just five to seven weeks. (Tr. at 135.)  As discussed below, the ALJ did not rely on that job in issuing the partially favorable decision.

the records were correct but said that another issue had popped up which he wanted to address with the doctor.  (Tr. at 123.)

The ALJ also noted that the Appeals Council directed him to consider obesity, although plaintiff did not appear to be obese, and the issue had not been raised at the first hearing.  (Tr. at 115-16, 124.)  Plaintiff testified that he weighed 206 pounds at a height of 5'6" or 5'7".  He indicated that his weight had varied from 195 to 205 pounds.  He stated that he tried to exercise by walking his dog around the block three times per day, for about 15 minutes.[7]  (Tr. at 124.)  Plaintiff denied that his weight interfered with him doing anything.  Asked about his activities, plaintiff mentioned walking the dog and mingling with people outside the hotel.  He denied doing any of the housekeeping.  The ALJ asked about a medical note dated September 29, 2015, after the carpal tunnel surgery but prior to the back surgery, which indicated that plaintiff had returned to his normal work activity without difficulty.  Plaintiff indicated that this referred to his work at the golf course.  (Tr. at 125.)

Asked about the back surgery, plaintiff indicated that he had no more pain in his back, and that Dr. Orton told him the x-rays of the fusion looked good.  The ALJ noted that in one of the records plaintiff asked when he could return to work as a housekeeper; the ALJ asked why, after the doctor released him, plaintiff did not go back to doing that work.  Plaintiff responded that his girlfriend did not want him to do it.  Asked why, he replied: "I guess she likes doing it." (Tr. at 126.)

Plaintiff testified that he was able to drive.  He further indicated that he had looked for work; "Any kind of job I could get."  (Tr. at 127.)  Asked if he viewed himself as ready to go back

---

[7]Later, on questioning by counsel, plaintiff testified that he walked the dog around the block about six times per day, using a cane when he did that.  (Tr. at 128.)

to work, he responded, "I'd like to go back to work, sir." (Tr. at 127.) Asked what he thought he could do, he mentioned work like he was doing at the golf course, which involved taking out the garbage, cleaning, and vacuuming. (Tr. at 127.)

Plaintiff testified that he lifted about ten pounds without pain; he had not tried to lift more because he was afraid he would hurt his shoulders. (Tr. at 128-29.) He stated that he had two torn rotator cuffs. Asked if he could lift overhead, he indicated that he had not tried. He could wash his hair without problems. He could also use his arms and hands constantly throughout the day. (Tr. at 129.) He indicated that he could sit for about 45 minutes before he had to get up and move around. He would lie down at times throughout the day because he got tired. (Tr. at 130.) He continued to take a number of medications for pain and restless leg syndrome. (Tr. at 130-31.) He indicated that he had pain in his shoulders and knee. He had not received treatment for his shoulders. His heart was doing fine. (Tr. at 131.) He indicated that the pain medication was effective in taking his pain away. (Tr. at 133.)

Asked if he could sustain full-time work, plaintiff responded: "It's been so long since I did it. I don't know what to say about that." (Tr. at 132.) He did think he could do a part-time job. He testified that he had been using a cane for about three years because of his right knee. (Tr. at 132.) He said that he used it whenever he left the house.[8] (Tr. at 133.)

---

[8]At the end of plaintiff's testimony, the ALJ asked counsel why this should not be a closed period case. Counsel responded that plaintiff should be eligible for a "trial work period." (Tr. at 133.) Social Security regulations authorize trial work periods to encourage benefit recipients to assess their ability to return to work without the implication that their disability has ended. Tumminaro, 671 F.3d at 633. During this trial period, an ALJ cannot consider the work being performed as evidence that the claimant is no longer disabled but may rely on other evidence to reach that conclusion. Id.

### b.    VE

The VE classified plaintiff's past work as "inspector," light and unskilled, SVP 2;[9] "cleaner/janitor," medium, SVP 2; "material handler," heavy, semi-skilled, SVP 3; "machine operator," medium, semi-skilled, SVP 3; and "maintenance" worker, medium, SVP 6.  (Tr. at 139-40.)  The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and experience, capable of work at the medium level, limited to frequent climbing of ladders, ropes, scaffolds, ramps, and stairs; frequent stooping, crouching, and crawling; and frequent flexing and extending of the neck.  (Tr. at 141.)  The VE testified that such a person could perform plaintiff's past work as an inspector and machine operator.  Reducing the level to light, the inspector job could still be done; reducing it further to sedentary would eliminate the past work.  (Tr. at 141.)  At the medium level, the person could also do other jobs, including laundry worker, packaging, and cleaner, and at the light level, kitchen helper, laundry helper, and assembly.  (Tr. at 142.)

### 7.    Second ALJ Decision

On November 22, 2016, the ALJ issued a partially favorable decision.  (Tr. at 27.)  The ALJ determined that plaintiff was disabled from December 16, 2014, the amended alleged onset date, through June 25, 2016.  The ALJ concluded that on June 26, 2016, medical improvement occurred related to the ability to work, and plaintiff was able to perform substantial gainful activity from that date through the date of decision.  (Tr. at 33.)

The ALJ determined that plaintiff had not engaged in substantial gainful activity since December 16, 2014.  (Tr. at 35.)  From December 16, 2014, through June 25, 2016, he had

_____

[9]The VE later explained that she selected a light inspector job under the DOT based on plaintiff's testimony that he carried bags weighing 15 pounds.  (Tr. at 144-45.)

the severe impairments of degenerative disc disease and osteoarthritis of the right lower extremity. The record referred to several other complaints and conditions, but none of them caused more than minimal work-related limitations, considered singly or in combination with his other impairments. The ALJ specifically noted that the remand order required him to consider plaintiff's obesity and left upper extremity condition. While the record showed that plaintiff had been overweight, his BMI ranged from just 30.5 to 32.6, not significantly obese. Further, plaintiff testified at the October 2016 hearing that his weight did not cause any limitations or interfere with his activities. (Tr. at 37.) The record also showed that in May 2015 plaintiff had been diagnosed with severe left-sided carpal tunnel syndrome, but he underwent surgery for this condition in July 2015, from which he recovered well, returning to full function with no restrictions by September 2015. (Tr. at 37-38.) The ALJ accordingly found that this condition did not persist at a severe level for 12 continuous months. (Tr. at 38.) The ALJ also considered plaintiff's complaints of bilateral shoulder pain but noted that plaintiff made those complaints sporadically, the objective medical evidence showed mild degenerative changes, and plaintiff's treating physician assessed no limitations in use of the upper extremities. (Tr. at 38.) Finally, while plaintiff had been diagnosed with coronary artery disease with stent placement, the medical evidence revealed this condition to be under good control, and plaintiff testified at the October 2016 hearing that his heart was fine and not causing him any problems. (Tr. at 39.)

The ALJ found that from December 16, 2014, through June 25, 2016, plaintiff did not have an impairment that met or medically equaled a Listing, considering Listing 1.02 (major dysfunction of a joint) and 1.04 (disorders of the spine). The evidence did not show an inability to ambulate effectively for 12 months or more, as required by 1.02(A) and 1.04(C). Nor was

there evidence of nerve root compromise as required by 1.04(A).  (Tr. at 39.)

The ALJ then determined that from December 16, 2014, through June 25, 2016, plaintiff retained the RFC to perform the full range of sedentary work.  In making this finding, the ALJ considered plaintiff's statements regarding his symptoms and the medical opinion evidence. (Tr. at 39.)

Plaintiff asserted that he was unable to work due to back pain, right leg problems, shoulder pain, and a heart attack with placement of two stents.  At the August 2015 hearing, he complained of chronic back pain, which he said was exacerbated by extended standing and walking.  He testified that he primarily spent his days sitting around.  He had been doing some work cleaning hotel rooms, for which he received a free room, but he indicated that his girlfriend took over the work in December 2014.  He underwent lumbar spine surgery in March 2016, and in October 2016 he testified that his back had improved since the surgery but he still sometimes experienced pain.  He said that he needed to use a cane for ambulation when he left home due to right knee pain.  He estimated that he could sit 45 minutes, walk 15 minutes, and lift 10 pounds.  (Tr. at 40.)

The ALJ stated:

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms.  After considering the evidence of record, the undersigned finds that the claimant's medically impairments could reasonably be expected to produce the alleged symptoms, and that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are generally consistent with the evidence, but only from the amended alleged disability onset date of December 16, 2014, through June 25, 2016.

(Tr. at 40.)

The ALJ noted that a May 2012 lumbar MRI showed disc dessication with a broad based

bulge at the L4-5 level with associated facet hypertrophy.  Plaintiff was initially treated with pain medications and injections.    A repeat MRI in January 2014 showed more significant degenerative changes.  (Tr. at 40.)  Shortly before the amended alleged onset date, plaintiff told his pain management physician that his pain was controlled for the most part, that a recent increase in the medication dosage and chiropractic care had been somewhat helpful, and that he had completed a course of physical therapy but had not been diligent about continuing a home exercise program.  (Tr. at 40-41.)

However, plaintiff testified that on the amended onset date he stopped working as a hotel housekeeper due to pain.  Subsequent progress notes showed lumbar spine tenderness to palpation, a mild increase in muscle tone, and some diminished reflexes.  Although some exams showed negative straight leg raising, full strength of the lower extremities, and non-antalgic gait, on other occasions he complained of pain on straight leg raising and was seen walking with a cane.  (Tr. at 41.)

Plaintiff complained of increased back pain in September 2015 after doing a lot of walking during a recent trip, but he also stated at that time that his TENS unit provided good pain reduction.  However, in January 2016, a lumbar MRI showed worsening of the disc space narrowing, and on March 9, 2016, Dr. Orton performed a laminectomy and fusion at L4-5.  Plaintiff initially used a walker after the surgery.  (Tr. at 41.)

Plaintiff did well after the procedure, experiencing significant improvement.    For example, on April 4, 2016, he reported that his back was "vastly improved" with almost no leg pain.  His primary care physician, Dr. Wagner, concluded that he was recovering well.  On April 21, 2016, plaintiff told Dr. Orton that he was experiencing only mild back pain that was well controlled on Oxycodone.  A physical exam showed some decreased range of motion and

tenderness, but he exhibited full strength in the lower extremities and straight leg raising was negative. Plaintiff complained of left-sided sciatica in May 2016, but straight leg raising was negative and he walked normally. Dr. Wagner added Prednisone and recommended physical therapy. On June 2, 2016, plaintiff again reported only mild low back pain that was well controlled on Oxycodone. According to Dr. Orton, plaintiff was very pleased with his post-operative course and ready to return to work. (Tr. at 41.)

Plaintiff had complained of only intermittent lower extremity pain. X-rays of the right tibia and fibula taken in June 2013 showed healing fractures. Although plaintiff complained of some increased knee pain in April 2016, physical exams at that time and through May 2016 showed only some medial joint tenderness with meniscal grinding. The exams otherwise showed no tenderness or effusion and normal range of motion of the right knee. Moreover, plaintiff walked with a normal gait. (Tr. at 41.)

The ALJ concluded that the evidence demonstrated a severe back impairment that caused intermittent exacerbations of pain relieved by sitting, which the RFC during the closed period accommodated. However, the evidence showed that plaintiff's back condition improved significantly with surgery and thus the limitation to sedentary work applied only through June 25, 2016. (Tr. at 42.)

As for the opinion evidence, in July 2013, Dr. Reintjes performed a consultative physical examination, concluding that plaintiff's back pain was well controlled when he was more sedentary. The ALJ gave this opinion some weight, as it was generally consistent with the evidence during the closed period. The ALJ also gave some weight to the opinions of the agency consultants, Drs. Chan and Khorshidi, who in 2013 found plaintiff capable of light work. The ALJ found these assessments appropriate based on the evidence in the record at that

time, although subsequent records showed a deterioration in plaintiff's back condition eventually requiring surgery, which warranted a limitation to sedentary work. The ALJ gave substantial weight to Dr. Khorshidi's opinion that plaintiff required no left shoulder limitations. (Tr. at 42.)

Based on the RFC for sedentary work, the ALJ determined that plaintiff could not, during the closed period, perform his past work as a janitor/cleaner, material handler, and machine operator, performed at the medium and heavy levels. Pursuant to the remand order, he re-evaluated the inspector job and concluded that it did not qualify as past relevant work as the duration requirement was not met. (Tr. at 43.) Finally, the ALJ determined that based on his age, education, work experience, and sedentary RFC, plaintiff qualified as disabled during the closed period under Medical-Vocational Rule 201.10. (Tr. at 44.)

The ALJ then turned to the medical improvement test, concluding that plaintiff had not developed any new impairments since June 26, 2016, and that his impairments did not, since that date, meet or equal a Listing. (Tr. at 44-45.) The ALJ determined that medical improvement had occurred as of June 26, 2016. Plaintiff underwent surgery in March 2016, and he improved significantly after that procedure. By the end of the closed period, plaintiff said his pain was well controlled and he was ready to return to work, and lumbar spine x-rays showed stable appearance of the surgical hardware. (Tr. at 45.) The ALJ concluded that this improvement related to plaintiff's ability to work, as his RFC had increased. Beginning June 26, 2016, the ALJ found that plaintiff retained the RFC for medium work with frequent climbing, postural movements, and flexing and extending of the neck. In making this finding, the ALJ again considered plaintiff's statements and the medical opinion evidence. (Tr. at 45.)

The ALJ concluded that plaintiff's claims regarding the intensity, persistence, and limiting

29

effects of his symptoms were not entirely consistent with the medical evidence and other evidence in the record for the time period beginning June 26, 2016. (Tr. at 45.) The ALJ noted that objective signs and findings from plaintiff's treating and examining physicians did not support his claim of disabling pain since that time. (Tr. at 45-46.) Plaintiff began reporting an improvement in his back pain and radicular symptoms by April 2016. Although he complained of left-sided sciatica in May 2016, straight leg raise was negative and he walked with a normal gait. By June 2, 2016, plaintiff again reported only mild back pain that was well controlled on Oxycodone. According to Dr. Orton, plaintiff was very pleased with his post-operative course and ready to return to work. Lumbar spine x-rays showed stable appearance of the surgical hardware, and the record showed no further significant complaints of or treatment for back pain since that time. "Thus, it is reasonable to conclude that the claimant's back condition improved to the point he is capable of performing medium exertion with additional postural limitations to account for some of the claimant's subjective complaints at the hearing." (Tr. at 46.)

The ALJ concluded that the limitation to a reduced range of medium work also accounted for plaintiff's lower extremity osteoarthritis. Progress notes during the closed period referred to only intermittent complaints of knee pain. During the consultative physical exam in July 2013, plaintiff exhibited crepitus in the right knee when flexed greater than 110 degrees and moved into a fully extended position, but he exhibited full range of motion bilaterally. Dr. Reintjes concluded that plaintiff's right leg functioned well. Although plaintiff complained of some increased knee pain in April 2016, physical exams at that time and through May 2016 showed only some medial joint tenderness with meniscal grinding. The exams otherwise showed no tenderness or effusion and normal range of motion of the right knee. Plaintiff was also observed walking with a normal gait. At the most recent visit in May 2016, Dr. Wagner

prescribed Prednisone and noted that plaintiff's pain was likely to improve with this medication. Although plaintiff testified that he had knee replacement surgery "coming up," the record contained no evidence that he continued to complain of or seek treatment for any knee pain complaints after that time. In addition to the limitation to medium exertion, the ALJ limited plaintiff to frequent climbing, stooping, crouching, and crawling to account for intermittent knee pain complaints. (Tr. at 46.)

The ALJ further noted that plaintiff's statements in the record and at the hearing suggested that his condition began to improve during the closed period to the point he had been capable of performing a reduced range of medium work since June 26, 2016. Plaintiff testified that he walked his dog on a daily basis, going around the block six times per day for approximately 15 minutes at a time. Although he reported using a cane, the record did not support a finding that use of a cane was medically necessary. Plaintiff further testified that he lived in a hotel with his girlfriend, where they cleaned the 15 hotel rooms in exchange for rent. He reported they had lived in this hotel for five years. Notably, plaintiff testified that he stopped cleaning in December 2014 due to pain, and his girlfriend took over these responsibilities. But in April 2016, just a few weeks after his back surgery, plaintiff asked Dr. Orton when he could return to housekeeping. (Tr. at 46.) This evidence, when considered with the objective medical evidence, further supported a finding that plaintiff remained capable performing work involving the reduced range of medium exertion in the RFC. (Tr. at 46-47.) For these reasons, the ALJ found plaintiff's complaints of disabling symptoms since June 26, 2016, not fully supported by the record. (Tr. at 47.)

The ALJ further found the conclusion that plaintiff was no longer disabled supported by the medical opinion evidence. In a progress note dated June 2, 2016, Dr. Orton, plaintiff's back

surgeon, indicated that plaintiff was released to return to "unrestricted work." (Tr. at 47.) The ALJ gave great weight to this assessment. Dr. Orton was an orthopedic specialist who had the opportunity to perform plaintiff's back surgery and treat him post-operatively. Dr. Orton's conclusion was also supported by his treatment notes, as well as the treatment notes from primary care physician Dr. Wagner. These notes documented plaintiff's consistent statements that his back pain and radicular symptoms had improved, as well as examination findings that included only some lumbar decreased range of motion and tenderness but otherwise full strength, negative straight leg raising, and a normal gait. The ALJ nevertheless limited plaintiff to a range of medium work to account for any intermittent back and knee pain. (Tr. at 47.)

Dr. Wagner, plaintiff's primary care physician, completed a physical activities assessment form on July 8, 2016. She opined that plaintiff was limited to lifting/carrying up to 50 pounds occasionally and 20 pounds frequently; that he could sit, stand, and walk for at least two hours at a time and for up to six hours total in an eight hour workday; and that he had no significant limitations in the ability to perform postural movements or in his ability to use his arms, hands, and fingers. However, she also opined that plaintiff needed to use a cane when engaging in even occasional standing or walking, needed the ability to shift positions at will, would likely need an additional 10-minute break during the workday, would likely miss two days per month, and that his symptoms would occasionally interfere with the attention and concentration needed to perform even simple work tasks. (Tr. at 47.)

The ALJ noted that a treating source's opinion is entitled to controlling weight if well-supported and not inconsistent with other substantial evidence in the record. (Tr. at 47.) A finding that the opinion does not meet the test for controlling weight does not mean that the opinion is rejected; it may still be adopted, considering the nature of the treatment relationship,

the consistency of the report with the other evidence, and the degree to which the source supported the opinion. (Tr. at 47-48.)

Applying these principles, the ALJ found that Dr. Wagner's report was not entitled to controlling or deferential weight; he instead gave it partial weight. He found her opinions regarding plaintiff's ability to lift, sit, stand, and walk generally consistent with the objective findings in the record since plaintiff's back surgery, which indicated that plaintiff had been the beneficiary of successful medical treatment. However, he gave little weight to the other limitations she suggested, as they were unsupported by objective signs and findings in both her progress notes and the other evidence of record, specifically the progress notes from the orthopedic surgeon, Dr. Orton. (Tr. at 48.)

In support of this finding, the ALJ again noted that the records following the surgery showed significant improvement after the procedure. Plaintiff consistently reported improvement in his back and radicular symptoms, and complained of only mild low back pain that was well controlled with medication, which he was taking only intermittently. Exams showed some lumbar decreased range of motion and tenderness, but he otherwise exhibited full strength in the lower extremities, negative straight leg raising, and a normal gait. The ALJ thus gave greater weight to the opinion of the orthopedic surgeon, Dr. Orton, who cleared plaintiff to return to work without restrictions. Specifically, he gave little weight to Dr. Wagner's opinion that plaintiff would miss two days of work per month, as this was speculative and unsupported by any significant objective findings, and to her opinion that plaintiff would have difficulty with concentration, which was also unsupported by objective findings as Dr. Wagner documented no significant mental status abnormalities or difficulty with concentration; Dr. Orton also documented a normal mental status exam at the most recent visit in June 2016. (Tr. at

33

48.)  The ALJ also gave little weight to Dr. Wagner's opinion that plaintiff needed a cane to ambulate, which appeared to be based primarily on plaintiff's subjective statement that he used a cane when he left home, as such a restriction was out of proportion to with the relatively mild objective findings documented since the March 2016 back surgery.  Further, in the most recent progress notes from Dr. Wagner in April and May 2016, plaintiff made no mention of the need for a cane, Dr. Wagner also made no mention of the use of any ambulatory aids, and at the most recent exam in May 2016 she documented normal gait and station.  At his most recent exam in June 2016, Dr. Orton advised plaintiff to walk as tolerated for exercise, and he also made no mention of the need for a cane.  Accordingly, the ALJ found that the use of a cane was not medically necessary.  (Tr. at 48.)

The ALJ noted that a closed period of disability was discussed at the hearing, but plaintiff's representative rejected that and suggested no potential dates.  Instead, he suggested that a trial work period was appropriate.  The ALJ found that unwarranted.  (Tr. at 48.)  Although plaintiff testified that he performed part-time work at a golf course clubhouse doing cleaning, he said he had not worked since March 2016, prior to the end of the closed period.  (Tr. at 48-49.)  He had not returned to full-time work since June 26, 2016.  The ALJ found that plaintiff's disability ended due to medical improvement, not due to the performance of substantial gainful activity.  (Tr. at 49.)

The ALJ then determined that beginning June 26, 2016, plaintiff had been capable of performing his past relevant work as a machine operator, as actually and generally performed, at the medium exertion level.  The ALJ noted that plaintiff worked as a machine operator for about two years, with earnings sufficient to establish this work as substantial gainful activity.  The record also established that plaintiff performed this job long enough to learn and

34

adequately perform the duties of this job, which was semi-skilled at an SVP level of 3. Finally, the job was performed with 15 years of the decision, thus qualifying it as past relevant work. The ALJ further accepted the testimony of the VE that a person with the RFC he found could do this job. (Tr. at 49.) In the alternative, the ALJ found that plaintiff could also perform other medium and light jobs, as identified by the VE, including laundry worker, packager, cleaner, kitchen helper, laundry helper, and assembler. (Tr. at 50-51.)

On May 4, 2017, the Appeals Council denied review of the ALJ's second decision. (Tr. at 1.) This action followed.

## III. DISCUSSION

**A.   RFC**

Plaintiff argues that the ALJ failed to properly evaluate his statements regarding the limiting effects of his symptoms for the period after June 25, 2016 (Pl.'s Br. at 4) and erred in rejecting portions of Dr. Wagner's July 2016 report (Pl.'s Br. at 10-11). He contends that because of these errors the ALJ understated his limitations in questioning the VE and determining RFC. (Pl.'s Br. at 20-21.)

### 1.   Legal Standards

In determining RFC, the ALJ must consider the entire record, including the claimant's statements regarding the limiting effects of his symptoms and the medical opinion evidence. See SSR 96-8p, 1996 SSR LEXIS 5, at *13-14. In evaluating the credibility of a claimant's statements, the ALJ must first determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2016 SSR LEXIS 4, at *5. Second, if the claimant has such an impairment, the

ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work. Id. at *9. If the statements are not substantiated by objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record and considering a variety of factors, including the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes to alleviate pain or other symptoms; treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. Id. at *18-19. The court reviews an ALJ's credibility finding deferentially, reversing only if it "patently wrong." Summers, 864 F.3d at 528.

Under the regulation applicable to plaintiff's claim, the medical opinion of a claimant's treating physician is entitled to "controlling weight" if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record. Campbell v. Astrue, 627 F.3d 299, 306 (7th Cir. 2010); 20 C.F.R. § 404.1527 ("Evaluating opinion evidence for claims filed before March 27, 2017."). If the opinion does not meet the test for controlling weight, the ALJ must decide how much value it does have, considering the length, nature, and extent of the treatment relationship; the support offered by the source for the opinion; the consistency of the opinion with the record as a whole; and the physician's specialty, if any. Campbell, 627 F.3d at 306; 20 C.F.R. § 404.1527(c). The ALJ must give "good reasons" for discounting the opinion of a treating source. 20 C.F.R. §

36

404.1527(c)(2).

While a treating physician's opinion is important, it is not the final word on a claimant's disability. Schmidt v. Astrue, 496 F.3d 833, 842 (7th Cir. 2007); see also Rudicel v. Astrue, 282 Fed. Appx. 448, 453 (7th Cir. 2008) ("[T]he ALJ, not any doctor, makes the final decision about whether a claimant is disabled."). The ALJ must base his RFC determination on the entire record and "is not required to rely entirely on a particular physician's opinion or choose between the opinions any of the claimant's physicians." Schmidt, 496 F.3d at 845. A treating source report may also contain opinions on several different issues, which the ALJ will evaluate separately. See Tenhove v. Colvin, 927 F. Supp. 2d 557, 572 (E.D. Wis. 2013). The Seventh Circuit has held that the ALJ may discount a treating physician's medical opinion if it contradicts the objective medical evidence, lacks support in the provider's own treatment notes, is based solely on the claimant's subjective complaints, or is inconsistent with the opinions of other physicians, see, e.g., Loveless v. Colvin, 810 F.3d 502, 507 (7th Cir. 2016); Henke v. Astrue, 498 Fed. Appx. 636, 640 (7th Cir. 2012); Ketelboeter v. Astrue, 550 F.3d 620, 625 (7th Cir. 2008), so long as he minimally articulates his rationale, Elder v. Astrue, 529 F.3d 408, 415 (7th Cir. 2008); see also Stepp v. Colvin, 795 F.3d 711, 718 (7th Cir. 2015) ("We uphold all but the most patently erroneous reasons for discounting a treating physician's assessment.") (internal quote marks omitted).

### 2. Analysis

The ALJ followed the required two-step process in evaluating plaintiff's symptoms. (Tr. at 39-40.) Specifically, he found that while plaintiff's impairments could reasonably be expected to produce some of the symptoms alleged, plaintiff's complaints of disabling symptoms after June 26, 2016, were unsupported by the record. (Tr. at 47.) The ALJ also

followed the proper procedure for evaluating the opinions of the treating physicians, Drs. Orton and Wagner, declining to afford either controlling weight, giving partial weight to Dr. Wagner's report and greater weight to Dr. Orton's opinion. (Tr. at 47-48.)  Plaintiff finds fault with various aspects of the ALJ's analysis, but his arguments are unpersuasive.

Plaintiff first criticizes the ALJ for including boilerplate language in his credibility assessment (Pl.'s Br. at 6), but use of such language is harmless so long as the ALJ also provides specific reasons for his finding.[10]  Pepper v. Colvin, 712 F.3d 351, 367-68 (7th Cir. 2013).  Here, in discounting plaintiff's claims of disabling symptoms after June 26, 2016, the ALJ provided a detailed discussion, noting the discrepancy between plaintiff's claims of continued disability and the evidence of significant improvement after the March 2016 back surgery, the limited objective findings, Dr. Orton's release to unrestricted work in June 2016, the absence of significant continued treatment after that time, and plaintiff's activities.[11]  (Tr. at 45-49.)

Plaintiff contends that the ALJ was required to specify which impairments he included in the credibility assessment, which symptoms he excluded, and which statements he credited. (Pl.'s Br. at 7, Pl.'s Rep. Br. at 3.)  However, the Seventh Circuit has never required this level of articulation.  See Shideler v. Astrue, 688 F.3d 306, 312 (7th Cir. 2012) ("[A]n ALJ's credibility findings need not specify which statements were not credible."); see also Lemerande v.

---

[10]Plaintiff also argues that the ALJ conflated RFC with the evaluation of credibility. (Pl.'s Br. at 6, Pl.'s Rep. Br. at 2.)  However, the ALJ did not use the same boilerplate language that troubled the court in Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012).

[11]Plaintiff appears to fault the ALJ for ending the closed period on June 25, 2016, as nothing of significance happened on that date.  (Pl.'s Br. at 7.)  Both of plaintiff's treating physicians concluded that he could return to some level of work as of June 2, 2016, so it is hard to see how the ALJ's adoption of a greater period was harmful.

<u>Berryhill</u>, No. 17-C-190, 2018 U.S. Dist. LEXIS 30303, at *9-10 (E.D. Wis. Feb. 26, 2018) ("An ALJ is not a polygraph machine that assesses each statement individually. That kind of detail is neither required nor necessary for judicial review.").

Plaintiff further contends that the ALJ was required to evaluate the combined effects of all impairments, even those deemed not severe, including obesity, coronary artery disease, carpal tunnel syndrome, and bilateral shoulder pain. (Pl.'s Br. at 5, 15; Pl.'s Rep. Br. at 4.) The ALJ did consider these impairments, singly and in combination with plaintiff's other problems, finding that they did not limit his ability to work. (Tr. at 37.) Because I read the ALJ's decision as whole, the fact that this discussion came earlier in his opinion does not mean it should be ignored. <u>See</u> <u>Curvin v. Colvin</u>, 778 F.3d 645, 650 (7th Cir. 2015). Specifically, the ALJ noted that plaintiff's BMI barely qualified him as obese, and that at the October 2016 hearing plaintiff testified that his weight did not cause any limitations or interfere with his activities. (Tr. at 37, 125.) The medical evidence similarly showed plaintiff's coronary artery disease to be under good control, and plaintiff testified that his heart was not causing him any problems. (Tr. at 39, 131.) Plaintiff did at the second hearing testify to continued problems with his left hand following the carpal tunnel surgery, but as the ALJ noted – both at the hearing and in his decision – the medical records showed that plaintiff recovered well from this surgery and returned to full function with no restrictions within about two months, as plaintiff conceded at the hearing. (Tr. at 37-38, 123, 125.) Plaintiff also testified that he was afraid to lift more than ten pounds (and had not tried to lift overhead) because of his shoulders. However, he admitted that he could wash his hair without problems, use his arms and hands constantly throughout the day (Tr. at 128-29), and had not received treatment for his shoulders (Tr. at 131), and the ALJ further noted that, in addition to the lack of objective medical support for plaintiff's shoulder

complaints, plaintiff's primary physician said he could lift up to 50 pounds and assessed no limitations in use of the upper extremities (Tr. at 38, 48, 1288). Dr. Khorshidi similarly concluded that plaintiff had no shoulder limitations. (Tr. at 42, 174-75.)

Plaintiff argues that the ALJ improperly relied on his own medical expertise in determining that the evidence did not fully support his claims regarding the period after June 26, 2016. (Pl.'s Br. at 8.) However, an ALJ is required to assess the medical evidence and make appropriate inferences from the record in evaluating credibility and determining RFC. See, e.g., Retzloff v. Colvin, 673 Fed. Appx. 561, 568 (7th Cir. 2016); Seamon v. Astrue, 364 Fed. Appx. 243, 247-48 (7th Cir. 2010); see also Knox v. Astrue, 327 Fed. Appx. 652, 655 (7th Cir. 2009) (stating that although the ALJ may not simply disregard subjective complaints unsupported by objective evidence, "he may view discrepancies with the medical record as probative of exaggeration"). The cases in which the Seventh Circuit concluded that an ALJ improperly "played doctor" are ones in which the ALJ ignored relevant evidence and substituted his own judgment. Olsen v. Colvin, 551 Fed. Appx. 868, 874-75 (7th Cir. 2014) (collecting cases). The ALJ did not do that here; rather, he primarily relied on the opinions of plaintiff's own doctors, both of whom concluded that plaintiff could return to some level of work in June 2016.

Plaintiff specifically contends that the ALJ rejected his testimony regarding his ability to lift and use his arms based on his own lay evaluation of the medical evidence (Pl.'s Br. at 9), but that is incorrect. In addition to discussing the objective medical evidence, the ALJ relied on the opinion of Dr. Wagner, who opined that plaintiff could lift up to 50 pounds and had no significant limitations in his ability to use his arms and hands. (Tr. at 47-48.) Dr. Orton went further – releasing plaintiff to work with no restrictions. The ALJ did not play doctor in finding

plaintiff capable of a range of medium work; he relied on the opinions of plaintiff's own physicians.[12]

Plaintiff argues that Dr. Wagner gave no opinion regarding his ability to use his upper extremities but rather left those spaces of the report blank. (Pl.'s Br. at 10, Pl.'s Rep. Br. at 9-10.) That is also incorrect. The form report asked: "Does your patient have significant limitations with reaching, handling or fingering?" (Tr. at 1288.) Dr. Wagner checked "no." (Tr. at 1288.) The report goes on to ask the provider, <u>if she answered yes to the preceding question</u>, to estimate the percentage of time her patient could use his arms, hands, and fingers for various activities. Having answered the preceding question no, Dr. Wagner appropriately left this space blank. (Tr. at 1289.) Further, as the ALJ noted, Dr. Wagner listed no arm or shoulder impairments among her diagnoses. (Tr. at 38, 1287.)

Plaintiff next argues that the ALJ erred in rejecting portions of Dr. Wagner's report. (Pl.'s Br. at 11.) As indicated above, the ALJ largely accepted her opinions regarding plaintiff's ability to lift, sit, stand, and walk, but found her conclusions regarding use of a cane, absences, and concentration deficits unsupported by objective signs and findings in both her progress notes and the other evidence of record, specifically the progress notes from the orthopedic surgeon, Dr. Orton. (Tr. at 48.) Plaintiff again argues that the ALJ was not qualified to evaluate objective signs and findings (Pl.'s Br. at 11), but the regulations <u>require</u> the ALJ to determine whether a treating source's report is "well-supported by medically acceptable clinical and

---

[12]The ALJ also relied on Dr. Khorshidi's opinion regarding plaintiff's alleged shoulder limitations. (Tr. at 42.) Plaintiff suggests that the ALJ failed to comply with the Appeals Council's remand order (Pl.'s Br. at 8-9), but the ALJ specifically addressed all of the issues the Council raised (Tr. at 37, 43). Contrary to plaintiff's argument, the Council made no findings regarding his use of the left upper extremity but rather remanded for further evaluation of that issue. (Tr. at 203-04.)

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). An ALJ does not play doctor by following the regulations.

Further, the ALJ provided specific reasons for rejecting these particular limitations.[13] Dr. Wagner estimated good and bad days, producing work absences, but as the ALJ noted, Dr. Wagner cited no evidence in support of this opinion. See 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion."). The ALJ also noted that following his surgery plaintiff consistently reported improvement in his back and radicular symptoms, with his mild low back pain well controlled with medication, and exam findings showed full strength, negative straight leg raising, and a normal gait.[14] See 20 C.F.R.

---

[13]Plaintiff argues in reply that the ALJ did not specify the conflicts with the record upon which he relied, but the block quote from the ALJ's decision plaintiff includes in his brief stops prior to that explanation. (Pl.'s Rep. Br. at 9.) In the next two paragraphs of his decision, the ALJ explained how Dr. Wagner's opinions on these issues conflicted with the evidence. (Tr. at 48.)

[14]Plaintiff contends that Dr. Orton did not evaluate "good days" and "bad days", as did Dr. Wagner, and that Dr. Orton released plaintiff on June 2, 2016 still using Oxycodone and with a return in 12 weeks for clinical and radiographic evaluation. (Pl.'s Br. at 11, Pl.'s Rep. Br. at 10, both citing Tr. at 1257.) Plaintiff fails to explain how a scheduled follow up undercuts Dr. Orton's release to "unrestricted work." (Tr. at 1257.) As the ALJ noted, the record showed no significant complaints of or treatment for back pain after Dr. Orton's release. (Tr. at 46.) As the ALJ further noted, plaintiff told Dr. Orton at the time of the release that his pain was mild and well controlled on Oxycodone. (Tr. at 41, 1253.) Dr. Orton noted: "He will continue to use Oxycodone as needed for pain." (Tr. at 1256.) Plaintiff contends that Dr. Wagner relied on objective findings not given by Dr. Orton, including sciatica, low back tenderness, and abnormal MRI of the lumbar spine, findings the ALJ was not qualified to evaluate. (Pl.'s Br. at 12.) As previously indicated, the ALJ is required to determine whether a treating source's opinion is well supported by objective findings; engaging in this analysis does not amount to playing doctor. In any event, Dr. Orton was aware of plaintiff's pre-surgical symptoms and the MRI findings (Tr. at 1225-30), and as the ALJ noted, post-surgical scans showed stable appearance of the surgical hardware, plaintiff's radicular symptoms resolved, and on exam he

§ 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). Dr. Wagner opined that plaintiff would have difficulty with concentration, but she documented no significant mental status abnormalities or difficulty with concentration, and Dr. Orton documented a normal mental status exam at the most recent visit in June 2016. (Tr. at 48, 1256.) Finally, while Dr. Wagner opined that plaintiff needed to use a cane, her most recent progress notes from April and May 2016 made no mention of the need for a cane, and at the most recent exam in May 2016 Dr. Wagner documented normal gait and station. At the most recent visit with Dr. Orton in June 2016, Dr. Orton advised plaintiff to walk as tolerated for exercise, also making no mention of the need for a cane. (Tr. at 48, 1256.)

Plaintiff argues that the ALJ missed the point that the cane was due to his knee problem, not his back problem. (Pl.'s Br. at 13, Pl.'s Rep. Br. at 10-11.) However, Dr. Wagner did not attribute use of a cane to plaintiff's knee; in fact, in her report she said nothing about his knee at all. (Tr. at 1287.) Plaintiff indicates that on February 23, 2016, he told Dr. Wagner his knee gave out when playing with his dog, and that during a July 1, 2016 visit, Dr. Wagner found tenderness at the medial joint line of the right knee. (Pl.'s Br. at 13, citing Tr. at 1201 & 1204-05.) The visits plaintiff mentions appear to have occurred on April 4, 2016 (Tr. at 1200-01), and May 4, 2016 (Tr. at 1203-05), both during the closed period. In any event, during the latter visit Dr. Wagner noted normal gait and station, indicated that she expected plaintiff's knee pain to resolve with use of Prednisone, and said nothing about a cane, as the ALJ recognized in his decision. (Tr. at 46, 48, 1205.) Plaintiff contends that the ALJ should have also considered

demonstrated full strength. (Tr. at 46, 1253, 1256.) There is no indication in the record that Dr. Wagner reviewed a more recent MRI that Dr. Orton did not see.

43

the combination of obesity and his bad knee (Pl.'s Br. at 13), but plaintiff told the ALJ at the hearing that his weight did not limit his functioning.  In sum, plaintiff fails to establish reversible error in the ALJ's failure to surmise that Dr. Wagner's cane limitation related to his knee (and, perhaps, his weight) rather than his back.[15]

Plaintiff argues that the ALJ failed to evaluate Dr. Wagner's opinion using the factors in 20 C.F.R. 404.1527 (Pl.'s Br. at 12), but he fails to develop the argument.  In any event, the ALJ set forth the corrects tests for evaluating treating source opinions, then considered the relevant factors, including the lack of support offered by Dr. Wagner for the rejected limitations, the inconsistency of those limitations with the other evidence of record, and (in giving greater weight to Dr. Orton's opinion) that physician's specialty as an orthopedic surgeon.  (Tr. at 47-48.)

Plaintiff next contends that rather than relying on his own lay opinion the ALJ should instead have called upon a medical consultant to evaluate objective medical findings.  (Pl.'s Br. at 13-14, Pl.'s Rep. Br. at 11.)  The ALJ is required to summon a medical expert only when the record is insufficient to decide whether the claimant is disabled, see Poyck v. Astrue, 414 Fed. Appx. 859, 861 (7th Cir. 2011), and a reviewing court will ordinarily uphold the ALJ's reasoned judgment on how much evidence is necessary, Nelms v. Astrue, 553 F.3d 1093, 1098 (7th Cir. 2009).  "Particularly in counseled cases, the burden is on the claimant to introduce some objective evidence that further development of the record is required."  Poyck, 414 Fed. Appx. at 861.  Plaintiff makes no such showing here.  In reply, plaintiff contends that the ALJ should

---

[15]The ALJ acknowledged plaintiff's testimony that he used a cane due to his knee (Tr. at 40, Pl.'s Br. at 15), but he later concluded that use of a cane was not medically necessary (Tr. at 48).

have re-contacted Dr. Wagner about the blank portions of her report. (Pl.'s Rep. Br. at 11.) As discussed above, Dr. Wagner did not leave the report blank; she indicated that plaintiff had no significant limitations in use of the arms and hands and thus did not fill in percentages.

Finally, plaintiff argues that the ALJ failed to properly assess certain aspects of his testimony under the SSR 16-3p factors. "The ALJ need not, however, discuss every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability." Jones v. Astrue, 623 F.3d 1155, 1162 (7th Cir. 2010); see also Pepper, 712 F.3d at 362 ("[A]n ALJ's adequate discussion of the issues need not contain a complete written evaluation of every piece of evidence.") (internal quote marks omitted). Plaintiff fails to show any significant omissions here.

Plaintiff contends that the ALJ failed to properly evaluate his medications and their side effects. (Pl.'s Br. at 15, Pl.'s Rep. Br. at 10.) While the ALJ did not specifically discuss all of the medications plaintiff had taken, he did note that plaintiff reported good control of his back pain with Oxycodone and that Dr. Wagner expected his knee and shoulder pain to improve with Prednisone. (Tr. at 46, 48.) Plaintiff complained of no medication side effects, so the ALJ was not required to discuss them. Plaintiff also notes his hearing testimony that he had knee surgery planned. (Pl.'s Br. at 15.) The ALJ acknowledged this testimony but discounted it as unsupported by the medical evidence. (Tr. at 46.) Plaintiff further indicates that at the hearing he testified that he could work part-time, but not full-time, and that he had to lie down during the day because he was tired. (Pl.'s Br. at 15.) But plaintiff's own doctors indicated that he could return to full-time work, with neither mentioning the need to lie down, and at the hearing plaintiff demurred on whether he could work full-time, stating: "It's been so long since I did it. I don't know what to say about that." (Tr. at 132.) The ALJ did not commit reversible error in

failing to more specifically discuss these issues.  And plaintiff contends that the ALJ failed to sufficiently consider his claimed limitations in daily activities, such as walking his dog.  (Pl.'s Br. at 16.)  The ALJ noted plaintiff's claim that he needed to use a cane when walking his dog but later explained why use of a cane was not medically necessary.  (Tr. at 46, 48).  Plaintiff argues in reply that unless the dog weighed 25+ pounds and he carried it around the block six hours per day, it does not comport with medium work.  (Pl.'s Rep. at 8.)  The ALJ never said that the dog walking proved plaintiff could handle medium work; he merely cited it as one piece of evidence supporting his finding of medical improvement.  (Tr. at 48.)

**B.      Past Relevant Work**

Plaintiff argues that the ALJ erred in concluding that he could return to his past work as a machinist.  Specifically, he contends that the ALJ failed to determine the precise duties of that job and then assess his ability to perform them.  (Pl.'s Br. at 16-20.)

### 1.      Legal Standards

As indicated above, at step four of the evaluation process (step seven in a closed period case), the ALJ decides whether the claimant can perform his past relevant work, either as he actually did it or as it is generally done in the economy.  In determining whether the claimant can perform a job as it is generally done, the ALJ will often rely on the job descriptions in the Dictionary of Occupational Titles ("DOT").  See SSR 82-61, 1982 SSR LEXIS 31, at *3-4.  In some cases, however, the claimant's past job will have no precise counterpart in the DOT but rather contains significant elements of two or more occupations.  In dealing with such a "composite job," the ALJ will ordinarily evaluate the job as the claimant actually performed it. See Michalski v. Berryhill, No. 16-C-1590, 2017 U.S. Dist. LEXIS 149090, at *16-17 (E.D. Wis.

46

Sept. 14, 2017).

In considering a job as actually performed, the ALJ should not simply describe the work in a generic way, e.g., "sedentary" or "light," and then conclude, on the basis of the claimant's RFC, that he can return to his previous work. See Tenhove, 927 F. Supp. 2d at 569. Rather, the ALJ should list the specific physical requirements of the previous job and assess, in light of the available evidence, the claimant's ability to perform those tasks. Nolen v. Sullivan, 939 F.2d 516, 518 (7th Cir. 1991).

### 2. Analysis

Plaintiff argues that the ALJ failed to determine the specific duties of his machinist job. Rather, he relied on the VE's testimony that the job corresponded to DOT # 619.685-062, called "machine operator." (Pl.'s Br. at 17.) Plaintiff contends that the job as set forth in this section of the DOT does not match the duties of his job as he described them at the first hearing and in his written submissions. (Pl.'s Br. at 18-19.) He further notes that the VE at the first hearing used a different DOT title in classifying the job. (Pl.'s Br. at 19.)

As the Commissioner notes, the problem with plaintiff's argument is that he failed to question the VE about conflicts with the DOT at the second hearing. When no one questions the VE's conclusions, the ALJ is ordinarily entitled to credit them. Liskowitz v. Astrue, 559 F.3d 736, 744 (7th Cir. 2009). The ALJ is required to address problems with a VE's testimony sua sponte only if the conflicts are "apparent" or "obvious." Terry v. Astrue, 580 F.3d 471, 478 (7th Cir. 2009); see, e.g., Fifield v. Berryhill, No. 17-C-81, 2017 U.S. Dist. LEXIS 188816, at *46-47 (E.D. Wis. Nov. 15, 2017) (affirming where the plaintiff argued in court that a different DOT section better described his past work, but he failed to raise the issue at the hearing).

In reply, plaintiff argues that the mismatch between his past job and the DOT is

apparent, but he offers little explanation as to how that is so. (Pl.'s Rep. Br. at 13.) The ALJ acknowledged that this was a semi-skilled job with an SVP of 3, and he found that plaintiff held it long enough to learn and adequately perform the duties of the job. (Tr. at 49.) Plaintiff says the ALJ was wrong about this but does not explain why. Plaintiff also contends that the ALJ failed to establish that the occupation met the limitations he gave the VE, such as frequent stooping, crouching, and flexing of the neck, but plaintiff develops no argument that the job could not be done with such limitations. (Pl.'s Rep. Br. at 13.)

At all events, as the Commissioner also notes, any step four problems were harmless because the ALJ went on to deny the claim at step five/eight based on the VE's identification of other jobs plaintiff could do within the RFC. See Guranovich v. Astrue, 465 Fed. Appx. 541, 543-44 (7th Cir. 2012) (finding step four error harmless based on alternate finding at step five). Plaintiff's only reply to the Commissioner's harmless error argument is that the ALJ's RFC and hypothetical questions understated his limitations. (Pl.'s Rep. Br. at 14.) He essentially concedes that, if the RFC is affirmed, he loses at step five/eight. For the reasons stated, I find that the ALJ applied the correct standards and supported his RFC determination with substantial evidence.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is affirmed, and this case is dismissed. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 27th day of June, 2018.

/s Lynn Adelman
LYNN ADELMAN
District Judge